1. Count 1 of the petition set forth a cause of action for the homicide of the plaintiff's son, and the court erred in sustaining the grounds of the defendant's general demurrer thereto.
2. Under count 2 of the petition recovery was sought only for damages because of the mutilation of the body of the deceased after the homicide, and inasmuch as the acts of the defendant were not shown to have been wilful and wanton, no cause of action was set forth in this respect, and the court properly sustained the grounds of the defendant's general demurrer to this count.
 DECIDED FEBRUARY 15, 1940.
Mrs. Ida S. Lumley brought suit against H. D. Pollard, as receiver of the Central of Georgia Railway Company, the petition in two counts as amended alleging substantially as follows: Count 1 alleged that the plaintiff was the widow of Jimmy G. Lumley, deceased, who left at his death a son of himself and the plaintiff, who was named Bill Jackson Lumley and who was seventeen years of age on September 26, 1937, and would have become eighteen years of age on October 13, 1937; that he was killed on the night of September 26, 1937, because of the negligence of the defendant as hereinafter set out, and at the time of his death was employed at $12 per week, in addition to going to school, and with his employer was taking certain training which in two years would enable him to earn $200 per month, and was her sole dependence and was contributing to her support twenty-five to fifty cents per day and was rendering services in connection with her household duties; that his burial expenses were $300; that he had an expectancy of 42.87 years; that Billy Lumley, her son, together with George Rogers, was riding in an automobile with Jack Garrett at the time of the son's death, at the invitation of Garrett, who was sitting on the front seat of the car and driving it, George Rogers sitting on the *Page 682 
right side on the front seat, and plaintiff's son sitting between them; that all three of the occupants of the automobile lived in Arlington, Georgia, and on September 26, 1937, went therefrom to Eufaula, Alabama, and were returning home by Georgetown and Fort Gaines and had passed through Georgetown and were traveling on the highway leading from Fort Gaines to Georgetown and known as highway No. 39, which intersects with State highway No. 50 leading from Cuthbert to Georgetown at a point east of Georgetown approximately one and one-half miles; that the Central of Georgia Railway leading from Cuthbert to Georgetown lies south of said State highway No. 50 in the County of Quitman and crosses the State highway No. 39, leading from Fort Gaines to Georgetown, a mile or more south of State highway No. 50; that it is the duty of railroad companies to keep in good order, at their expense, the public roads or private ways established pursuant to law, where crossed by their several roads, and build suitable bridges and make proper excavations or embankments, according to the spirit of the road laws; that State highway No. 39 is a public highway kept up and worked by the State of Georgia and was on September 26, 1937, but said bridge and its approaches were constructed prior to the act of 1927, which provided for the elimination of bridge (grade) crossings, and have not been improved or bettered since said act, and the said receiver has not bettered or improved the same since its construction or since his appointment as receiver of said railroad, but has maintained it in the same condition as constructed by the Central of Georgia Railway Company; that all of the acts charged to the railroad company herein are likewise charged to the said receiver of said railroad company in the maintenance of said bridge and its approaches thereto, as well as in the operation of said railroad by him as receiver; that the bridge across said railroad on said highway No. 39 is a railroad bridge and is kept up by the defendant, and its approaches thereto are so maintained, and it is the duty of the defendant to construct the approaches to said bridge across the railroad so that there would be no sharp curve in the road at the approach to the bridge, and the bridge and railroad not be concealed from a traveler over said highway approaching the bridge, and the bridge and its approaches not increase the hazard in the use of the bridge by travelers in vehicles as they turn the sharp curve on the road onto *Page 683 
the bridge; that it is also the duty of the defendant to construct the approaches to said bridge so that the road at said point would not be wider than the bridge and would not be constructed in such a way that its width would be misleading to travelers thereon, and the railroad cut in which the railroad is situated, as well as the bridge across the same, would be open and exposed to view of travelers approaching the bridge in the night as well as in the daytime; that it is the duty of the defendant to erect and maintain suitable guard-rails on its bridges, and to construct the approaches to its bridges so that the hazard to travelers will not be increased, and that such approaches should be kept clear of loose pebbles, sand, etc., to prevent the sliding and skidding of automobiles; that at the point where the said highway No. 39, leading from towards Georgetown towards Fort Gaines, crosses said railroad there is a deep cut, in which said railroad is situated, of approximately thirty feet, and a bridge commonly known as the "wire bridge" spans this cut and railroad above and across the railroad; that this bridge is approximately eighty-three feet long and eighteen and one-half feet wide and approximately thirty-three feet from the north end of said bridge to a point over the center of the railroad tracks; that said cut passes through a hill and is in the top or through the crest of the hill, the railroad running approximately east and west at said point; that the railroad is perfectly straight on the east side of the bridge for at least one-half mile, but bends and turns to the right after it passes under the bridge going westwardly, and the highway, crossing said bridge, before it reaches it coming from the north runs in a southeasterly direction but makes a sharp bend or curve just as it approaches said railroad and the railroad bridge; that highway No. 39, approaching said bridge from the north, is from twenty-eight to thirty feet wide, and at abutment of the bridge is wider than thirty feet, and about three hundred feet before it reaches said railroad descends a steep hill or grade into a bottom, valley, or depression, and when within about a hundred feet of the bridge and railroad cut and railroad ascends a sharp hill or incline, and just before reaching the bridge turns shortly, sharply, and abruptly to the right at a sharp angle, so sharp that only the outer edge of the right side of the road meets the right side of the bridge, when, if it continued straight, it would have gone to the left side of the bridge and missed it entirely; that the bridge being *Page 684 
only approximately eighteen and one-half feet wide, the left side of the road for a distance of fifteen feet or more misses the bridge entirely and without any railing, obstruction, or anything else to prevent a person traveling thereon from running into said cut; that the angle at which the road approaches the bridge and its abutment, and which is a part of the construction of the bridge and its abutment, is such that the natural consequences of a person traveling on the said highway, who is not well acquainted with the situation, in driving and operating his automobile would either miss the bridge entirely going to the left side thereof or strike the left side thereof in attempting to go over and onto the bridge or strike the same on its left side; that a person traveling southward on highway No. 39 from towards Georgetown towards Fort Gaines at night can not see the railroad bridge until he is within approximately twenty feet of it, and there was not, on September 26, 1937, any marks or signs on the highway or on said bridge or near the bridge to indicate the presence of the bridge on the highway, or the presence of the railroad and railroad cut running across the highway, or to expose the great risk and danger to a traveler in approaching said crossing and passing on same; that the highway, as it approached the bridge, widened out until there were approximately fifteen to twenty feet of the same on the left side entirely unenclosed and without signs or warning that there was a deep cut open in said space of fifteen feet or more on the left side of the bridge, so that with a person coming up the hill in the nighttime the headlights of his car would be thrown upward and he could not see the cut or the bridge until within a few feet thereof, and until it would be too late to save himself from the peril of falling therein and to his death; that a person approaching said railroad on the highway from the north could not, on September 26, 1937, see the bridge across the railroad at said point at night, or the cut through which the railroad runs, until within a few feet of either, because (a) the highway or road, as it approaches said bridge, is so constructed by the defendant and maintained that it lies within a cut with banks on each side thereof, and especially on the right side thereof; (b) that said road, as it approaches said bridge and cut and railroad, runs uphill towards the same, keeping the headlights shining above the bridge and railroad and not on the bridge and railroad; (c) that the road, within sixty feet *Page 685 
of the bridge and cut, turns shortly and abruptly to the right, and an automobile headlight could not shine upon the bridge or disclose the same to a traveler and a driver until within a few feet thereof, and not within time to avoid plunging over the embankment onto the railroad or else running into the left side of the bridge and skidding into the cut; (d) that the bridge sets at an angle which turned farther to the right, different from the road and not in line with it, which makes it more difficult in approaching and going onto the bridge, and which can not be seen by a traveler approaching from the north; (e) that the bridge across the railroad is so constructed that it is at an angle to the highway, and the highway, as it approaches from the north, approaches at an angle, which throws the bridge entirely to the right and out of line with the headlights of an automobile coming up to said bridge and cut, the approach being uphill, the said cut being in the crest of the hill and through the top thereof, and the bridge being likewise so constructed, the width of the bridge, with all of the unoccupied space of the road by the bridge, being to the left of the bridge and running up to the cut, and the sharp angle of the road and curve of the road, together with the embankments thereof on the right side, concealing the bridge and railroad cut from a traveler, so that the headlights of an automobile at night and in the daytime could not disclose the presence of the bridge on the railroad cut until the driver thereof would be within a few feet, twenty feet or more, of said cut and railroad bridge; (f) that a traveler thereon, unfamiliar with the road, approaching the bridge and railroad cut at night from the north, has concealed from him, by reason of the foregoing facts, the great risk and peril to him and his car, in that he can not see the bridge until within a few feet of the railroad track in time to stop the car or turn to the right sufficiently to pass onto the bridge and avoid running into the deep railroad cut and killing himself and those with him; that on Sunday night, September 26, 1937, at approximately 8:50 o'clock, Jack Garrett, with Billy Lumley and George Rogers in his car, coming from the north and from towards Georgetown and down said road at a lawful rate of speed, came up said hill, and, because of the construction of the approaches to the bridge as above stated, was unable to see the railroad or the railroad bridge or the cut, because of the embankment on the right side of the road, the extreme width of the road at the *Page 686 
point where it touched the railroad bridge, the sharp and abrupt curve of the road to the right, the upgrade to the bridge, the angle of the approach of the road to the bridge, the construction of the approach to the bridge, and because there was no warning and there were no signs to indicate a bridge, a railroad, or a deep cut across the highway; that he came onto the very bank of the cut before it could be discovered, and too late to save himself and his guests from running off into the cut and onto the railroad, killing himself and Billy Lumley and injuring George Rogers and demolishing the car in which he was riding; that the automobile left the said public highway at an angle and just to the left of the bridge as it attempted to turn to the right and plunged a distance of forty feet or more in said railroad cut on said railroad, and the driver, Jack Garrett, and Billy Lumley were killed by reason of said fall, the car striking the end of the rail on the bridge, the same being rotten and unsafe, and the car sliding farther on the loose dirt and pebbles; that defendant was negligent in allowing the said pebbles and loose dirt to accumulate on and near the bridge and its abutment and thereby contribute to the proximate cause of the death of the said Lumley; that the defendant was negligent and the railroad company negligent in the following respects, the railroad company, prior to the taking over of the company by the receiver, H. D. Pollard, and H. D. Pollard, as receiver, since the taking over by him of said company as receiver, continuing the maintenance of the said bridge, its approaches, abutment and entrances thereto as hereinbefore and hereinafter set forth: (a) that said railroad company was negligent in constructing the bridge and approaches thereto in such manner that there would be a deep and sharp curve to the right in highway No. 39 in approaching the bridge from the north, said curve turning so deep and so far to the right that a straight line with the right side of the road would go to the left side of the bridge, and an automobile coming up said road to the bridge with headlights as required by law would not disclose to the driver thereof, and did not disclose to Jack Garrett, the driver, the bridge or the railroad track until within a few feet thereof; (b) that said railroad company was negligent in so constructing the approaches to the bridge in such manner that the approach thereto was fifteen feet or more wider than the bridge; that in coming from the north and approaching the bridge that *Page 687 
part of the road which did not intersect with the bridge was left entirely on the left side of the bridge so that there was nothing to warn the approach of the said Garrett of said cut, no sign and no indications of anything that would warn him of the railroad bridge or cut until he had reached the top of the hill and reached within a few feet of the cut and the bridge too late to either stop or turn in any other way to avoid the peril of death by falling into a thirty-foot cut; (c) that said railroad company and said defendant were negligent in allowing said space, which ended that part of the road in the cut on the left side of the bridge, to remain open without any warning or sign that said condition existed; (d) that said railroad company and said defendant were negligent in not maintaining a fence, an embankment, or other obstruction from the left side of the bridge or east side northward approaching the left bank of the highway, so that said fence or other obstruction might have acted as a warning to people traveling thereon; (e) that said railroad company was negligent in allowing the open cut and unenclosed part of the highway, which appeared to be a part of the highway as said car approached from the north and which opened into said cut so that there was no warning to the driver of the car; (f) that said railroad and defendant were negligent in constructing said approaches to the bridge, and in allowing the same to be on a sharp and abrupt curve and up a hill at the crest thereof, without any warning to show the same, and thereby concealing the railroad cut and the bridge from the view of the said Jack Garrett, the driver of the car; (g) that said defendant was negligent in failing to place a red reflector in said portion of the road not taken up by the bridge, so as to warn a traveler of the danger thereon; (h) that all of the acts in the construction of said bridge, its abutments on the north side thereof, the curve in the approach, the width in the approaches, the angle of the bridge as to the road as well as across the railroad and as to the approach of the road to the bridge on the brow of the hill, and all other acts herein alleged of the railroad company prior to the said receivership and of the said H. D. Pollard as receiver were the proximate cause of the death of the said Billy Lumley and the injury and damage to plaintiff as more fully hereinbefore set forth. It was alleged that the plaintiff had been damaged in the sum of $30,000 by reason of the facts hereinabove set forth, and judgment and process were prayed. *Page 688 
The second count of the petition set forth the same allegations of facts and circumstances as in the first count, with respect to the bridge, the cut, the approaches, the abutment and roadway, and further alleged that on the night in question Jack Garrett, with Billy Lumley and George Rogers in his car, coming from the north and from towards Georgetown and down said road at a lawful rate of speed, came up said hill, and that because of the construction of the approaches to the bridge as above stated and of the situation in regard to the bridge and railroad cut as above stated, and because of the impossibility of seeing said bridge and railroad cut the car ran off into the cut after striking a rotten post or corner of the bridge and Billy Lumley was killed; that all of the acts of the defendant in constructing and maintaining the bridge, the approaches thereto and the width of the road thereon, all of which were on its right of way, were acts of negligence, and were the cause of the failure of the driver of the car to see the bridge and the cut and the cause of his plunging therein, the said Billy Lumley and the other occupants of the car striking the railroad and the car remaining thereon, the same happening a few minutes before a freight train of the defendant approached from towards the east on said railroad; that the train, as it came towards the said Billy Lumley and the wrecked car, came up a grade and necessarily would have been under better control for stopping, but that within a few feet of where said car was resting on the track just east of the railroad bridge the grade sloped towards the left and the tracks turned gradually to the right and made a curve or bend in said railroad; that there was a railroad station known as "Wire-Bridge" station on said railroad at which there was a stop about one-half mile east of the bridge, but that said train, driven by the engineer of the train, came on, notwithstanding that the said car on the track was in plain view of the engineer for a distance of one-half mile or more, and ran into the car, caught the same upon the front part of the engine and carried it a distance of approximately fifteen hundred feet, the car, as it passed under the said railroad bridge, striking the post to said bridge and dragging on the crossties the said distance before it stopped, thereby mutilating, bruising, and maltreating the body of the said Billy Lumley so that it was crushed, bruised and disfigured; that Billy Lumley was not a trespasser on said track but was thereupon because of the carelessness *Page 689 
and negligence of the said railroad company and the maintenance of its public crossing, the abutments thereto, and the road thereto as set forth, and that it was due solely to these acts of the defendant that the said Billy Lumley was upon the railroad in said car with a mortal wound and unable to protect himself; that said track was used by pedestrians going from said station and to said station and had been for many years; that the said engineer operating the train was negligent and grossly negligent in approaching said automobile and running over it, and all of his acts were further acts of negligence of the defendant; that he saw the car in time to have stopped the train, or should have seen it and would have seen it had he not negligently been otherwise engaged in conversation and total inattention to his duties, and his acts and conduct in approaching said Billy Lumley and running over him in his condition aforesaid were wanton and wilful; that said acts have greatly humiliated, grieved, and embarrassed plaintiff and caused her great mental anguish, distress, and pain in the crushing and abuse of her son, or the body of her son, in the manner as aforesaid. The petition alleged that she had been damaged in the sum of $10,000, and judgment and process were prayed.
The defendant filed general and special demurrers to each count of the petition, and after the amendment renewed the same. The court, without passing on the special demurrers, sustained the grounds of the general demurrer to both counts of the petition, and the exception here is to that judgment.
1. Count 1 of the petition, by allegations of facts fully set forth in the foregoing statement, charges that the defendant, by its negligence, brought about the death of the plaintiff's son, a minor upon whom she was dependent and who contributed to her support. Briefly summarized, the alleged negligence consisted in the defendant's failure to keep and maintain the railroad bridge and its approaches in a condition safe for travelers lawfully thereupon. The only question to be decided is whether, as contended by the plaintiff, the duty with respect to the safety of the bridge and its approaches rested upon the defendant or, as contended by the defendant, devolved upon the State Highway Department of Georgia. The Code, § 94-503, provides: "All railroad *Page 690 
companies shall keep in good order, at their expense, the public roads or private ways established pursuant to law, where crossed by their several roads, and build suitable bridges and make proper excavations or embankments, according to the spirit of the road laws." The Code, § 94-504, provides: "Such crossings shall include the width of land on both sides of the road allowed by charter or appropriated by the company therefor, and as many feet beyond, each way, as is necessary for a traveler to get on and off the crossing safely and conveniently." These provisions of law have long existed, and are to be found in the first Code (1863) under sections 678 and 679, the first having been codified from the act of 1838, approved December 31, 1838. It has been held by the Supreme Court that the duties here enjoined by the legislature in the exercise of its police power are continuing duties, and that a railroad's obligation in the premises has not ended merely because it has provided a crossing which is adequate for travelers at the time of its construction, but that the obligation has reference to all future exigencies of travel, and that "the duty of the railroad company to construct and maintain, at its own expense, suitable crossings at the intersection of the railroad with highways, applies as well to highways laid out and opened after the construction of the railway as to those existing prior to its construction." Cleveland v. Augusta, 102 Ga. 233,247 (29 S.E. 584, 43 L.R.A. 638). See also, in this connection, Southern Ry. Co. v. Atlanta Rapid Transit Co.,111 Ga. 679 (36 S.E. 873, 51 L.R.A. 125).
"The term `bridge' includes all the appurtenances necessary to its proper use, and embraces its abutments and approaches," and whatever "is necessary as an approach, to connect the bridge with the highway, is an essential part of the bridge itself."Howington v. Madison County, 126 Ga. 699 (55 S.E. 941);Atlantic Coast Line R. Co. v. Spearman, 42 Ga. App. 536,540 (156 S.E. 824). "An embankment contiguous to a bridge and made as a necessary means of access thereto, so as to enable teams and wagons to pass over it, is a part of the bridge, and the authorities charged with using ordinary care for the purpose of keeping the bridge in reasonably safe condition for use by the public in the ordinary modes of travel are under a duty to use a similar measure of diligence in regard to such abutment or approach." Morgan County v. Glass, 139 Ga. 415 (4) (77 S.E. 583). In constructing and maintaining *Page 691 
a bridge consideration must be had to the physical surroundings and conditions of the highway approaching the bridge. Hardin v.Southern Ry. Co., 36 Ga. App. 427 (136 S.E. 802); SeaboardAir-Line Ry. Co. v. Young, 40 Ga. App. 4 (6) (148 S.E. 757); Central Ry. Co. v. Keating, 45 Ga. App. 811, 817
(165 S.E. 873). It is for the jury to determine whether a railroad properly constructs and maintains an approach for such distance on each side of the bridge as to enable a traveler to get on and off the crossing safely and conveniently. Central of Georgia Ry.Co. v. Dumas, 44 Ga. App. 152 (8) (160 S.E. 814).
It is contended by the defendant in error that under the grade-crossing elimination act of 1927 (Ga. L. 1927, p. 299), as codified in the Code, § 95-1901 et seq., the public highways of the State are under the sole control and direction of the State Highway Department of Georgia, and that the liability of a railroad for failure to maintain its bridges and approaches safe for travel no longer exists. It has however been held inAtlantic Coast Line R. Co. v. Spearman, supra, that the provisions of law, Code §§ 94-503 and 94-504, were not repealed by the act creating the State Highway Department and establishing a system of State roads (Ga. L. 1919, p. 242, Code, § 95-1501 et seq. and § 95-1701 et seq.), and in Central of Georgia Ry. Co.
v. Keating, supra, it was held that the grade-crossing elimination act did not take away the duties of the railroad as prescribed in the Code, §§ 94-503 and 94-504. Central of GeorgiaRy. Co. v. Keating, 177 Ga. 345 (170 S.E. 493); s. c.47 Ga. App. 336 (170 S.E. 497). The Supreme Court ruled that as the bridge in question in that case was constructed prior to 1927, and neither the county nor State authorities had taken any steps to bring about its improvement or betterment, the Court of Appeals properly held that in these circumstances the act of 1927 was inapplicable. It was shown in the opinion that sections 8 and 9 of the act, Code §§ 95-1908 and 95-1909, compel this conclusion. The Code, § 95-1908, provides: "Whenever in the judgment of the Department exercised in respect of a State road, or in the judgment of a county board exercised in respect of a county public road, an existing underpass or overpass, constructed prior to the approval of this chapter, is unsafe or inadequate to serve the traffic for which it was constructed, the Department, when State roads are involved, or the board, when county public roads are involved, *Page 692 
may proceed to bring about the improvement or betterment of the existing structure. In any such event the procedure and division of the cost of construction and the cost of the maintenance of such improvement or betterment shall be as herein set forth in sections 95-1903 to 95-1906 and 95-1909." The Code, § 95-1909, provides: "After the construction of an overpass or underpass, it shall be the duty of the Department in the case of State roads, and of the county board in the case of county public roads, to maintain at its or their own expense the drainage, surface, and pavement of the highway and bridge, as well as the approaches and guard-rails, if any, except that when an overpass is constructed with a floor of wood, then the railroad or railroads shall maintain such floor. It shall be the duty of the railroad or railroads to maintain at its or their expense the foundations, piers, abutments, and superstructure of all underpasses and overpasses located within the limits of its right of way." It is alleged in the petition that there has been no improvement or betterment of the bridge and approaches, but that they have always been maintained and controlled by the railroad company prior to its receivership and since then by the receiver. In these circumstances it could not be said that the State Highway Department has assumed any authority or dominion over the crossing so as to relieve the defendant of the duty of proper maintenance. Nor is the principle of law enunciated in Callaway
v. Georgia Railroad Banking Co., 53 Ga. App. 785
(187 S.E. 399) and Shedd v. Pollard, 55 Ga. App. 828 (191 S.E. 492) applicable, as contended by counsel for the defendant in error, to the alleged facts of the present case. Here there is no allegation that the bridge was constructed under any plans or specifications, by requirement of any governmental agency, but it is shown that the railroad built the same according to its own ideas prior to the act of 1927. Since, therefore, neither the State Highway Department nor any county authority had made any improvement or betterment of the existing structure, and the bridge and its approaches were not built under the specific plans or specifications of any governmental agency, the original duty of the railroad has not in any wise been changed, and upon proof of the negligence alleged in count 1 of the petition the plaintiff would be entitled to recover.
It is urged by counsel for defendant in error that the petition shows that the bridge was under the control of the State Highway *Page 693 
Department because it is alleged that "State highway No. 39 is a public highway, kept up and worked by the State of Georgia, and was on the 26th day of September, 1937." This is not equivalent to alleging that the bridge and its approaches were under the control of or had been worked by the State of Georgia, and immediately after the above-quoted language it was alleged "but said bridge and its approaches were constructed prior to the act of 1927, and have not been improved since said act but that the railroad or receiver have continued to maintain the same in the same conditions as originally constructed." The son of the plaintiff was a guest of the driver of the car. No joint mission or control over the car or the manner of operating it was shown. The petition does not disclose that the death of the son was solely caused by the negligence, if any, of the driver, or that the son by the exercise of ordinary care could have avoided the consequences of the negligence of the defendant. Inasmuch as count 1 of the petition set forth a cause of action, the court erred in sustaining the defendant's general demurrer thereto. Since it clearly appears from the order of the court that only the grounds of the defendant's general demurrer were passed upon, we have not undertaken to pass upon the questions raised by special demurrers, and in remanding the case have left open for determination the grounds of the special demurrer. Simpson v.Sanders, 130 Ga. 265, 271 (60 S.E. 541); Wofford Oil Co.
v. Calhoun, 183 Ga. 511, 512 (189 S.E. 5); Willingham v.Glover, 28 Ga. App. 394 (1) (111 S.E. 206); Hunter v.Moss, 41 Ga. App. 13, 15 (151 S.E. 831).
2. In the second count of the petition the plaintiff seeks to recover, as next of kin, for pain and suffering because of the mutilation of her son's body after the alleged homicide. InPollard v. Phelps, 56 Ga. App. 408 (1) (193 S.E. 102), it was held: "While it is well settled that for mere negligence one can not recover damages for mental pain and anguish unless there has been damage to person or purse, it is equally well established that for a wanton and wilful tort or for a reckless disregard of the rights of others, equivalent to an intentional tort by the defendant, the injured party may recover for the mental pain and anguish suffered therefrom. . . While at common law there can be no property in a dead body, the right to its possession and disposition is a quasi property right which the courts will recognize and enforce, and, in the absence *Page 694 
of testamentary disposition, the right of preservation and burial, to receive the body in the same condition in which it was when death supervened, belongs to the husband or wife, or, if none, to the next of kin." While it is alleged that the automobile was in plain view of the engineer for a distance of half a mile, it was not unequivocally alleged that he actually saw it, and only negligence, or a failure to see it, was set forth. Notwithstanding that it is alleged that the engineer wantonly and wilfully ran over the dead body, the specific facts alleged show only that he "saw the wrecked car [not the body] in time to have stopped the train or should have seen it and would have seen it had he not negligently been otherwise engaged in conversation and total inattention to his duties." These facts do not show actual knowledge of the dead body on the track, and the allegations charge only constructive knowledge (Thomas v.Georgia Granite Co., 140 Ga. 459, 460, 79 S.E. 130;Atlantic Coast Line R. Co. v. Spearman, 42 Ga. App. 536,546, 156 S.E. 824), which does not sustain the conclusion that the engineer's acts were wilful and wanton. Nor do any facts alleged show such a reckless disregard of the rights of others as to amount to wilfulness and wantonness. It is shown under count 2, as well as in the brief of counsel for the plaintiff in error, that recovery was sought therein only for damages because of the mutilation of the body after the homicide, and in the absence of wilfulness and wantonness in running over the body no cause of action in this respect was set forth. The trial court properly sustained the defendant's general demurrer on this ground.
Judgment reversed. Stephens, P. J., and Felton, J., concur.